UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Block Communications, Inc., et al.,                           Case No.  3:18-cv-1315

                Plaintiffs,

      v.                                          MEMORANDUM OPINION
                                     AND ORDER

Moorgate Capital Partners, LLC, et al.,

                Defendants.

## I.  INTRODUCTION

Defendants Moorgate Capital Partners, LLC ("MCP"), Moorgate Securities, LLC (collectively, "Moorgate"), and Defendant-Counterclaim Plaintiff LMC Southeast Cable Partners, LLC ("LMC SE"), have filed a motion for summary judgment on all claims against them, as well as on LMC SE's counterclaim.  (Doc. Nos. 49 and 50).[1]  Plaintiffs-Counterclaim Defendants Block Communications, Inc. ("BCI") and BCI Mississippi Broadband, LLC ("MaxxSouth"), have filed a brief in opposition.  (Doc. Nos. 63 and 64).  Defendants have filed a brief in reply.  (Doc. Nos. 68 and 69).

Defendants also filed a motion to compel production of certain documents.  (Doc. Nos. 37 and 38).  Plaintiffs oppose this motion as well.  (Doc. Nos. 41 and 42).  Defendants filed a reply brief.  (Doc. Nos. 45 and 46).

---

[1]  I previously granted the parties leave to file under seal unredacted versions of their briefs and certain documents covered by a protective order.

For the reasons stated below, Defendants' motion for summary judgment is granted in part and denied in part, and their motion to compel is denied as moot.

## II.  BACKGROUND

Based in Toledo, Ohio, BCI is a diversified media company with operations in cable television, commercial telecommunications, television broadcasting, newspaper publishing, and billboard advertising.  Of particular relevance to this litigation, BCI owns and operates two regional cable systems, one of which serves Northwest Ohio and Southeast Michigan, while the other – MaxxSouth, BCI's wholly-owned subsidiary – serves North and Central Mississippi, and Northwest Alabama.

MCP is a boutique investment bank working primarily with companies in technology, media, and communications.  MCP, along with its wholly-owned subsidiary Moorgate Securities, operates offices in New York and California.

In 2011, BCI contracted with Moorgate for advice on and assistance with refinancing BCI's corporate debt.  The parties' letter agreement identified John White and Michael Alexander (both of whom were members of the Moorgate entities) as the "primary contacts" for Moorgate, and Allan Block (the Chairman of BCI's Board of Directors), Jodi Miehls (BCI's Chief Financial Officer and a member of BCI's Board of Directors), and Sara LaBudda (BCI's Treasurer), as BCI's principal contacts.  (Doc. No. 49-3 at 2).  By all accounts, this initial engagement was successful, and the parties continued to do business together.

In May 2012, BCI and MCP entered into an agreement (the "Retention Agreement"), pursuant to which MCP was to provide investment banking services and advice in exchange for a monthly fee of $10,000.  (Doc. No. 49-3 at 13-19).  The term of the Retention Agreement was open ended, continuing until one party provided written notice of termination, and it included a restrictive covenant which gave Moorgate the first opportunity to advise and assist BCI with "a potential joint

2

venture, merger, acquisition, asset disposition, sale or equity capital raising transaction . . . ." (*Id.* at 14). The Retention Agreement also required Moorgate to keep confidential, throughout the term and for two years after the termination of the agreement, all of BCI's nonpublic information, subject to certain exceptions. (*Id.*).

A few months later, Moorgate advised BCI as BCI sought to acquire a company called Baja Broadband, which was managed by Last Mile Communications, LLC. While visiting Baja's offices, Alexander and Jon Meyers, an MCP vice president, met Peter Kahelin, one of Last Mile's members. Alexander and Meyers introduced Block to Kahelin in January 2013, during BCI's ultimately unsuccessful bid to acquire Baja.

Last Mile primarily provided management services to cable companies that were interested in attracting investors or potential purchasers, or which recently had been acquired and were in a transition period under new ownership. After the Baja transaction, Alexander and Meyers pursued potential business opportunities with Last Mile, which were focused primarily on cable systems operating in Alabama, Texas, and Georgia. Eventually, Moorgate and Last Mile settled on a formal business arrangement, and the two filed articles of organization for LMC SE with the Delaware Secretary of State on April 11, 2014.

Meanwhile, Moorgate and BCI continued to pursue potential acquisitions of other cable systems. These efforts culminated in successful acquisitions of Line Systems, Inc., in May 2014, and Detroit Outdoor, LLC, in early 2015, as well as a regional cable system operating in Mississippi and Alabama. On June 4, 2014, BCI and Moorgate Securities entered into a letter agreement under which Moorgate Securities was to "provide investment banking advisory services to [BCI] in connection with an acquisition of . . . MetroCast Communications of Mississippi, LLC . . . ." (Doc. No. 49-3 at 21 (the "MaxxSouth Agreement")). That purchase closed in November 2014.

3

It is the MaxxSouth transaction that is the source of the parties' disputes in this case. The parties agree that Moorgate encouraged BCI to contract with LMC SE to manage MaxxSouth (the "Management Agreement"), that BCI chose LMC SE in no small measure because of Moorgate's recommendation, and that Moorgate had a conflict of interest regarding LMC SE such that Moorgate would be "effectively representing" LMC SE in the negotiation of the Management Agreement. (Doc. No. 49-4 at 13).

BCI asserts, however, that none of the Moorgate principals informed BCI of the nature of this conflict of interest – that a Moorgate entity (Moorgate Private Capital, LLC) held a 50% membership interest in LMC SE. Alexander, Meyers, and Kahelin each assert they spoke with Block, Miehls, and one of BCI's attorneys (David Waterman), on multiple occasions about the fact that Moorgate had an interest in LMC SE, though the record does not reflect any written communication to that effect in 2014.

The Management Agreement called for LMC SE to manage the day-to-day operations of MaxxSouth and other cable systems BCI might acquire in the future. (Doc. No. 49-3 at 35-36). LMC SE's management of the business was subject to BCIs "ultimate and absolute plenary control over the policies, financing[,] and operations" of MaxxSouth. (*Id.* at 38). The Management Agreement called for BCI to pay LMC SE a monthly management fee, as well as an incentive fee based upon MaxxSouth's value at the time of a future sale or the termination of the Management Agreement. (*Id.* at 39-40). The Incentive Fee was to be 12.5% of the increase in MaxxSouth's value, as determined by mutual agreement or by "an independent third party valuation firm . . . based upon an analysis of the recent prices paid by purchasers of similar companies under similar circumstances." (Doc. No. 49-8 at 34-35, 40-41).

The parties' relationship continued without any apparent hiccups until April 2017, when Block, Miehls, Alexander, and White had a meeting at the National Association of Broadcasters

convention in Las Vegas, Nevada.  The parties agree they discussed transitioning management responsibilities for MaxxSouth away from LMC SE, the eventual calculation of the Incentive Fee, and Moorgate's interest in the Incentive Fee.  Alexander recalls telling Block and Miehls specifically that Moorgate had an ownership interest in LMC SE.  (Doc. No. 49-1 at 28).

While Moorgate believed the meeting was uneventful, Block and Miehls deny Alexander told them that Moorgate had an ownership interest in LMC SE and assert they were shocked by Alexander's statement that Moorgate had a financial interest in the Incentive Fee.  BCI claims it took no action at this time because "LMC SE – and more specifically, Moorgate – had BCI over a barrel," as BCI "had no suitable replacement that could take over at a moment's notice."  (Doc. No. 63 at 25).

The next incident of note occurred a few months later, on July 26, 2017.  BCI requested a meeting with Kahelin to discuss what BCI asserted were unauthorized capital expenditures which resulted in MaxxSouth exceeding its capital budget by $3.1 million.  Kahelin disagreed with BCI's position, arguing BCI previously had permitted capital spending above budget for new cable installations.  The discussion then took a turn, with Kahelin stating Moorgate had a 50% interest in the Incentive Fee and further announcing that he was going to retire from LMC SE.  While Moorgate contends it had revealed its involvement long before this meeting, BCI claims this was the first time it learned the nature and extent of Moorgate's conflict of interest involving LMC SE.[2]

---

[2]  Defendants argue "Block understood Moorgate's representation of Kahelin and Last Mile to mean a relationship more akin to that of a headhunter or job placement service and client."  (Doc. No. 63 at 21).  It is unclear why Block would have believed that to be the case, as he had observed Kahelin's successful efforts on behalf of Baja and was very familiar with Moorgate's work as an investment advisor, not a headhunter.

At any rate, this dispute is not material.  BCI did not contract with LMC SE because of its understanding of LMC SE's ownership group, but because it specifically desired Kahelin's management services.  (Doc. No. 49-5 at 55 (August 2, 2017 letter from Miehls to Kahelin (BCI's "decision to engage Last Mile was based upon [Kahelin's] reputation and expertise in this area."))).

A few weeks later, Block, Miehls, Alexander, and Meyers met at Moorgate's New York offices to discuss Moorgate's interest in LMC SE, as well as Kahelin's pending retirement and the impact it would have on the management of MaxxSouth. At that time, Alexander provided Block and Miehls with verbal confirmation of Moorgate's 50% ownership interest in LMC SE and also showed them a redacted copy of LMC SE's operating agreement. (*See, e.g.,* Doc. No. 64-4 at 37-39 (Miehls dep. transcript, Day 1)).

Following these discussions, BCI and LMC SE executed an amendment to the Management Agreement (the "2017 Amendment"), which took effect on September 1, 2017. (Doc. No. 49-3 at 55-56). The 2017 Amendment provided that the term of the Management Agreement would end on March 31, 2018, and that BCI and LMC SE would use their best efforts to determine MaxxSouth's value and pay the Incentive Fee no later than May 15, 2018. (*Id.* at 55). BCI and LMC SE agreed to promote Randy Santiago, previously the Chief Operating Officer, to succeed Kahelin as CEO. (*Id.* at 56). Further, BCI and MaxxSouth "waive[d] any right to claim termination for cause based upon the assertion that [LMC SE] overspent its 2017 capital budget as of the date of [the 2017] Amendment." (*Id.*).

The parties' relationship again proceeded without apparent incident until the spring of 2018. Kahelin sent Block and Miehls an email regarding the upcoming end of LMC SE's management of MaxxSouth, stating in part that Alexander would contact Block and Miehls on behalf of LMC SE and Kahelin "to initiate the process that will finalize the Incentive Fee payout . . . ." (Doc. No. 49-7 at 23-24).

Moorgate provided its proposed Incentive Fee calculation a few days later. BCI took issues with the data Moorgate used to calculate MaxxSouth's value and objected to Moorgate's allegedly aggressive posture in negotiating the Incentive Fee. After Moorgate repeatedly rejected BCI's requests that it step aside and allow BCI to negotiate with Kahelin, BCI suspended the Retention

Agreement (which governed Moorgate and BCI's banking and investment relationship) and retained a third party valuation firm, Waller Capital LLC, to prepare a report on MaxxSouth's value for use in calculating the Incentive Fee (the "Waller Report").

While Moorgate estimated MaxxSouth's value within the range of $250 to $325 million, the Waller Report estimated its value at $125 to $195 million – less than the $200 million BCI paid to acquire MaxxSouth four years earlier. The parties continued negotiations, including during a meeting in New York on May 15, 2018, but made no meaningful progress. BCI initiated this litigation a few weeks later, on June 8, 2018.

### III.  STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's favor. *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014). A factual dispute is genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed fact is material only if its resolution might affect the outcome of the case under the governing substantive law. *Rogers v. O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### IV.  ANALYSIS

Plaintiffs asserts ten causes of action: breach of fiduciary duty against Moorgate Securities (Count I) and against MCP (Count II); breach of contract against Moorgate Securities (Count III),

MCP (Count V), and LMC SE (Count VII); breach of the implied covenant of good faith and fair dealing against Moorgate Securities (Count IV) and MCP (Count VI); fraudulent inducement against Moorgate Securities and MCP (Count VIII); imposition of a constructive trust on amounts paid or owed to Moorgate Securities and MCP (Count IX); and injunctive relief related to the appointment of a third-party firm to provide a valuation of MaxxSouth (Count X).  Defendants seek summary judgment on all ten counts, as well as on LMC SE's counterclaim for breach of the Management Agreement.

### A.   FIDUCIARY DUTY CLAIMS

The Moorgate Defendants argue they are entitled to summary judgment on BCI's breach of fiduciary duty claims because the parties' relationship was created by contract and the facts do not establish the parties had created a fiduciary relationship outside of the terms of the contracts.  BCI disputes these arguments and further contends summary judgment on these claims is inappropriate because "New York courts do not employ a bright line test to determine whether a fiduciary relationship exists" and because this is an inherently fact-intensive question.  (Doc. No. 63 at 32).

As the Moorgate Defendants note, BCI attempts to deflect attention from the first necessary step in this inquiry – are the fiduciary duty claims "based upon the same facts and theories as [the] breach of contract claim[s]."  *Brooks v. Key Tr. Co. Nat. Ass'n*, 809 N.Y.S.2d 270, 272 (N.Y. App. Div. 2006).  "[B]eing a party to a contract does not itself impose a fiduciary duty.  Rather, this duty must arise from a position of trust or special confidence . . . that impose[s] obligations beyond the express agreements between the parties."  *Gasery v. Kalakuta Sunrise, LLC*, 422 F. Supp. 3d 807, 819 (S.D.N.Y. 2019) (citation omitted) (second alteration in original); *see also Snyder v. Wells Fargo Bank, N.A.*, 594 F. App'x 710, 712 (2d Cir. 2014) (summary order) ("Where, as here, the parties' relationship originated in contract, a plaintiff suing for breach of fiduciary duty must prove that the

8

parties 'created a relationship of higher trust than would arise from [their contract] alone.'" (quoting *EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y 2005))).

BCI contends the parties had a fiduciary relationship because BCI "granted Moorgate near unfettered access to BCI's most confidential business information," and "reposed confidence in Moorgate and relied upon Moorgate's superior expertise and knowledge related to financial advisory services and investment banking advice." (Doc. No. 63 at 34, 35-36). BCI further argues the Moorgate Defendants' internal policies "expressly confirm that it occupies a fiduciary position for the benefit of its customers." (*Id.* at 37).

Like the circumstances before the court in *Brooks*, the allegations underlying BCI's fiduciary duty claims – "based upon defendants' [purported] self-dealing[ and] conflict of interests . . . – are either expressly raised in plaintiff's breach of contract claim or encompassed within the contractual relationship by the requirement implicit in all contracts of fair dealings and good faith." *Brooks*, 809 N.Y.S.2d at 272. BCI entered into contracts with the Moorgate Defendants for the purpose of accessing their "superior expertise and knowledge" and gave the Moorgate Defendants access to confidential information for the purpose of facilitating investment advice. Moreover, BCI fails to show how the general statement in the Moorgate Defendants' internal policies applies to specific facts to create a fiduciary duty above and beyond the terms of the parties' written contracts.

The Moorgate Defendants are entitled to summary judgment on BCI's fiduciary duty claims because BCI does not identify evidence apart from the terms of the contracts sufficient to support an independent fiduciary duty claim.

### B.    BREACH OF CONTRACT

The Plaintiffs asserts the Defendants have breached the MaxxSouth Agreement, the Retention Agreement, and the Management Agreement. They also claim the Moorgate Defendants

breached the implied covenant of good faith and fair dealing implicit in the MaxxSouth and Retention Agreements.

The parties agree New York law applies to the MaxxSouth Agreement and the Retention Agreement and Ohio law applies to the Management Agreement. To state a breach of contract claim, a plaintiff must present "proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525 (2d Cir. 1994) (citing *Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.,* 612 F. Supp. 134, 137-38 (S.D.N.Y. 1985)); *see also Carbone v. Nueva Constr. Grp., L.L.C.*, 83 N.E.3d 375, 380 (Ohio Ct. App. 2017) ("In order to substantiate a breach of contract claim, a party must establish four elements: (1) a binding contract or agreement was formed; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach.") (citations omitted)).

The covenant of good faith and fair dealing is implied by New York law into every contract and "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir. 1989). While "[t]he implied covenant includes any promises which a reasonable promisee would be justified in understanding were included[,] . . . no obligation may be implied that would be inconsistent with other terms of the contractual relationship." *1357 Tarrytown Rd. Auto, LLC v. Granite Prop., LLC*, 142 A.D.3d 976, 977, 37 N.Y.S.3d 341, 343 (N.Y.A.D. 2016) (citations omitted).

### 1. Counts III and IV

BCI asserts Moorgate Securities breached the MaxxSouth Agreement by "using nonpublic, confidential information BCI provided pursuant to the MaxxSouth Agreement for leverage in its negotiations with BCI regarding the . . . Incentive Fee and disclosing such confidential information to LMC SE." (Doc. No. 1 at 21). BCI also alleges Moorgate Securities breached the covenant of

good faith and fair dealing implied in the MaxxSouth Agreement by failing to inform BCI that the Moorgate Defendants had an ownership interest in LMC SE and by continuing to participate in negotiations concerning the Incentive Fee. (*Id.* at 22). Both claims fail.

The term of the MaxxSouth Agreement expired on the date the MaxxSouth transaction closed. (Doc. No. 49-3 at 22). Moorgate Securities agreed to keep confidential "all nonpublic information regarding [BCI] provided to it by [BCI]" for a period of two years after the end of the contract term. (*Id.*). BCI's claim that "the MaxxSouth Agreement did not conclude until 2018 when it became clear that Moorgate would not be assisting BCI in negotiating the Incentive Fee, as BCI expected" runs contrary to the express written terms of the contract. (Doc. No. 63 at 44). Those written terms, not BCI's subjective expectations, govern. The terms of the MaxxSouth Agreement no longer were in force in 2018.

Lastly, even if a jury could conclude BCI did not know of Moorgate's ownership interest in LMC SE when BCI executed the MaxxSouth Agreement[3] in 2014, the Incentive Fee determination is a matter covered by the LMC SE Agreement, not the MaxxSouth Agreement. BCI fails to offer any evidence to support its conclusion that this alleged failure to disclose deprived BCI of its right to receive the benefits of the MaxxSouth Agreement. *P.T. & L. Contracting Corp. v. Trataros Const., Inc.*, 29 A.D.3d 763, 764, 816 N.Y.S. 508, 508 (N.Y.A.D. 2006); *cf. Duration Mun. Fund, L.P. v. J.P. Morgan*

---

[3] BCI points to differences in a failed deal between Moorgate, Last Mile, and a company with Morris Communications as evidence of Moorgate's duplicity. (Doc. No. 63 at 14-15). BCI takes issue with the fact that the draft agreement in the Morris deal specifically named both Last Mile and MCP as owners of the entity that would manage the Morris system, yet the Management Agreement did not. (*Id.* at 14). This argument fails upon closer inspection.

While the Morris deal did in fact name MCP specifically, it did so because Moorgate and Last Mile had not yet formed their joint venture. (*See id.* at 14 ("This letter is to confirm the understanding between Morris . . . and Last Mile Communications ("LMC"), **an entity to be formed by Last Mile Communications LLC and Moorgate Capital Partners LLC** . . . ." (emphasis BCI's))). They had done so by the time the parties began negotiations for the Management Agreement and used the name of the now-formed entity accordingly.

*Sec., Inc.*, 77 A.D.3d 474, 475, 908 N.Y.S.2d 684, 685 (N.Y.A.D. 2010) (affirming dismissal of breach of covenant of good faith and fair dealing action where the complained-of transactions were not governed by the contract at issue).

Moorgate Securities is entitled to summary judgment on Counts III and IV.

### 2.    Counts V and VI

Defendants argue Count VI must be dismissed because it is duplicative of Count V.  While BCI argues its good-faith-and-fair-dealing claims are not duplicative because they are based on different underlying facts, it does not confront the Moorgate Defendants' specific arguments about Counts V and VI.  (*See* Doc. No. 63 at 46).

"A cause of action to recover damages for breach of the implied covenant . . . 'cannot be maintained' where 'the alleged breach is intrinsically tied to the damages allegedly resulting from a breach of the contract.'" *Zam & Zam Super Mkt., LLC v. Ignite Payments, LLC*, 736 F. App'x 274, 278 (2d Cir. 2018) (quoting *Deer Park Enters., LLC v. Ail Sys., Inc.*, 57 A.D.3d 711, 712, 870 N.Y.S.2d 89, 90 (N.Y.A.D. 2008)).

Count V and VI contain the same allegations concerning MCP's conduct as it relates to the Retention Agreement: "MCP has breached its obligation of good faith and fair dealing by engaging in the acts and omissions alleged above, including (a) failing to inform BCI that it had an ownership interest in LMC SE, and (b) continuing to engage in negotiations over LMC SE's Incentive Fee despite its conflict of interest." (*Cf.* Doc. No. 1 at 23, ¶ 93 *with* Doc. No. 1 at 24, ¶ 98).  The Moorgate Defendants are entitled to summary judgment on Count VI because BCI offers no evidence that Counts V and VI in fact are separate claims.

In Count V, BCI asserts, in addition to MCP's alleged breach of the implied covenant of good faith and fair dealing, that MCP breached the Retention Agreement by "disclosing BCI's

nonpublic, confidential information to LMC SE in negotiations with BCI regarding [the] Incentive Fee." (Doc. No. 1 at 23).

While, as BCI argues, New York law may permit a plaintiff to prove improper disclosure of confidential information through circumstantial evidence, BCI offers only conclusions, not evidence. As Moorgate points out, BCI has not identified any confidential information contained in the Incentive Fee projections that BCI did not itself share with LMC SE.  Further, BCI's allegations of Moorgate's "nefarious" scheme to capitalize on BCI's concerns about its ability to manage MaxxSouth with in-house personnel are no more than allegations.  Block believed BCI needed someone with specific knowledge on running a rural cable network, which BCI did not have among its in-house personnel, (*see* Doc. No. 49-1 at 131), and individually had reached a positive assessment of Kahelin's abilities and qualifications from the Baja auction.  BCI has not shown Moorgate misused any confidential information in recommending that BCI contract with Kahelin and LMC SE to operate MaxxSouth.

Nor has BCI shown Moorgate's posture with regard to the Incentive Fee breached the Retention Agreement or the implied covenant of good faith and fair dealing.  The Retention Agreement called for Moorgate to "provide investment banking advisory services." (Doc. No. 49-3 at 13).  The four corners of the contract do not support BCI's assertion that Moorgate also had a duty to represent BCI in discussions concerning the Incentive Fee.  *See 1357 Tarrytown Road Auto, LLC*, 142 A.D.3d at 977 (The covenant of good faith and fair dealing cannot be used to "create additional obligations not contained" in the parties' written agreement.).

Finally, BCI's complaint that Alexander misused BCI's confidential information by pointing out the Waller Report "may imply the need to significantly write down one of your better performing businesses" holds no water.  Even if BCI could show this statement depended upon confidential information rather than publicly-available data – and it offers no evidence to that effect

13

– the confidentiality provisions required only that Moorgate and its principals not disclose confidential information to third parties.  There is no reason to think Moorgate was prohibited from mentioning BCI's protected information in conversations with BCI.

Thus, MCP also is entitled to summary judgment on Count V.

### 3.      Count VII

In Count VII, BCI argues LMC SE breached the Management Agreement by "defer[ring] passively to prior ownership's policies" in maintaining MaxxSouth's financial records and determining the number of subscribers, "capitalizing certain activities in violation of [generally accepted accounting principles ("GAAP")]," causing MaxxSouth to exceed its Capital budget, and failing to disclose that Santiago, Kahelin's replacement as CEO, previously had been convicted of a felony.  (Doc. No. 63 at 51-53).

The Management Agreement called for LMC SE to prepare and maintain MaxxSouth's records "in accordance with policies and deadlines established" by BCI.  (Doc. No. 49-3 at 34). BCI's assertion that "no one at BCI advised LMC SE . . . whether LMC SE should continue to implement MetroCast's policies," (Doc. No. 63 at 28), means – at best – that BCI implicitly delegated its contractual responsibilities to LMC SE.  Whatever the "reality" of MaxxSouth's policies, BCI cannot show LMC SE's alleged decision to "capitaliz[e] certain activities in violation of GAAP," (*id.*), constitutes a breach of the Management Agreement when it offers no evidence that LMC SE's conduct was inconsistent with any policy BCI implemented.

BCI has neither shown that LMC SE's conduct violated the general contractual provision concerning the applicability of GAAP nor the more specific contractual provision assigning to BCI the sole duty to dictate MaxxSouth policies.  *See, e.g., Monsler v. Cincinnati Cas. Co.*, 598 N.E.2d 1203, 1209 (Ohio Ct. App. 1991) ("A specific [contractual] provision controls over a general one.").  Thus,

BCI fails to show LMC SE breached the Management Agreement through the manner in which it prepared MaxxSouth's financials.

The Management Agreement prohibited LMC SE from making "any capital investment in excess of the amounts set forth in the operative Operating Budget or Capital Budget."  (Doc. No. 49-3 at 35). It also required LMC SE to "keep [BCI] informed of any material deviation from the then-current Operating and Capital Budgets as soon as [LMC SE] becomes aware of such deviation . . . and [to] provide [BCI] with [LMC SE's] recommended course of action" to bring MaxxSouth back into compliance with the Operating and Capital Budgets.  (*Id.* at 38).

While BCI takes the position that the $3.1 million in above-budget expenditures "were a material breach of the Management Agreement," (Doc. No. 63 at 28), these claims are not backed up by the text of the Management Agreement, BCI's subsequent conduct, or Ohio law.  The Management Agreement itself did not give BCI the right to terminate the contract on this basis. (*Id.* at 42-43).  Instead, the contract called for LMC SE to keep BCI informed and to develop a plan to get back into compliance.

Then, in the 2017 Amendment, BCI "waive[d] any right to claim termination for cause based upon the assertion that [LMC SE] overspent its 2017 capital budget as of [August 31, 2017]."  (Doc. No. 49-3 at 56).  Further, BCI specifically chose its remedy for any undisclosed capital expenditures, agreeing in the 2017 Amendment that such expenditures "shall be added to the Initial Company Enterprise Value for the purpose of determining [LMC SE's] Incentive Fee."  (*Id.* at 56).).

In Ohio, a "'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Marion Family YMCA v. Hensel*, 897 N.E.2d 184, 186 (Ohio Ct. App. 2008).  Viewed in the light most favorable to BCI, the fact that LMC SE

15

caused MaxxSouth to exceed its capital budget did not defeat the essential purpose of the contract or make it impossible for BCI to perform.

BCI's assertion that LMC SE breached the Management Agreement by failing to inform BCI that Santiago had been convicted of a felony also lacks merit. While it accuses LMC SE of "ignor[ing] the language of the Management Agreement itself by arguing that BCI's costs associated with investigating Kahelin's replacement are not recoverable," (Doc. No. 63 at 52), BCI disregards the express condition that BCI's termination rights concerning an uncured breach involving an executive's "conviction of any felony involving monies or other property" are triggered only if that breach (that conviction) occurred "during the Term" of the Management Agreement. (Doc. No. 49-8 at 40).

To the contrary, the evidence plainly establishes Santiago's conviction did not occur during the term of the Management Agreement, and therefore LMC SE had no contractual duty to disclose that conviction to BCI. Whatever the rationale for BCI's decision to retain a forensic accounting firm to review MaxxSouth's books, BCI fails to offer any evidence that it resulted from a breach of contract.

BCI also implies LMC SE breached the Management Agreement because it was not sufficiently forthcoming about Moorgate's role in the business. BCI claims it "did not take immediate action upon learning [in April 2017] about Moorgate's interest" in the Incentive Fee because it "had no suitable replacement that could take over at a moment's notice." (Doc. No. 63 at 25). But this claim is immaterial. The Management Agreement did not permit BCI to terminate LMC SE "at a moment's notice." Instead, it required BCI to provide at least 90 days written notice before terminating the Management Agreement "for any reason or no reason." (Doc. No. 49-3 at 43). Further, instead of pursuing a "suitable replacement," BCI chose to continue its relationship with LMC SE, changing course only when Kahelin announced his retirement.

16

BCI has not identified any contractual obligations LMC SE failed to perform.  *Carbone*, 83 N.E.3d at 380.  Therefore, it cannot establish LMC SE breached the Management Agreement and I need not further consider the parties' arguments concerning damages.  LMC SE is entitled to summary judgment on Count VII.

### C.    FRAUDULENT INDUCEMENT

Defendants argue they are entitled to summary judgment on Plaintiffs' fraudulent inducement claim because BCI ratified the Management Agreement by executing the 2017 Amendment "with full knowledge" of the facts surrounding the involvement of the Moorgate Defendants in LMC SE, and because BCI cannot established any element of a fraudulent inducement claim under New York law.  (Doc. No. 49 at 40-41).

A plaintiff alleging fraudulent inducement must present evidence of "a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury."  *Pasternack v. Lab. Corp. of Am. Holdings*, 59 N.E.3d 485, 491 (N.Y. 2016) (citations omitted) (alteration in original).  A party may be held to have waived its right to challenge a contract allegedly procured through fraud if the party undertakes an act ratifying the contract after the discovery of the fraud.  *Braddock v. Braddock*, 871 N.Y.S.2d 68, 76 (N.Y. App. Div. 2009).

Plaintiffs dispute Defendants' arguments, contending BCI did not ratify the Management Agreement because BCI was forced to execute the 2017 Amendment under duress due to "Kahelin's unexpected decision to retire and LMC SE's inability to identify a comparable replacement threatened the $200,000,000 investment BCI made in Mississippi."  (Doc. No. 63 at 48).  They further argue the Moorgate Defendants' failure to disclose their interest in LMC SE was a

material omission and that BCI justifiably relied on this omission because of its fiduciary relationship with the Moorgate Defendants.[4]  Neither argument is persuasive.

Under New York law, a contract may be voidable by a party who has been induced to enter the contract by duress.  *DiRose v. PK Management Corp.*, 691 F.2d 628, 633 (2d Cir. 1982).  "To establish economic duress a plaintiff must demonstrate that the agreement was obtained: (1) by means of a wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative."  *Nelson v. Stanley Blacker, Inc.*, 713 F. Supp. 107, 110 (S.D.N.Y. 1989).  "[T]he person claiming duress must act promptly to repudiate the contract . . . or he will be deemed to have waived his right to do so."  *DiRose*, 691 F.2d at 633-34.

BCI claims it had no option other than to execute the 2017 Amendment because "[a]n immediate dismissal of LMC SE would leave MaxxSouth without management and been financial suicide."  (Doc. No. 63 at 48).  BCI's argument, however, is not persuasive.  Rather than being precluded from exercising free will, BCI asserts it "quickly arranged[5] for the early termination of the Management Agreement . . . ."  (*Id.* at 49).  While BCI claims it acted quickly in repudiating the Management Agreement, it offers no evidence it initially entered into the Management Agreement because of duress or that it ever repudiated the 2017 Amendment.

_____

[4]  While the complaint includes a fraudulent inducement claim, BCI's arguments point toward a fraudulent concealment claim.  *See, e.g., PetEdge, Inc. v. Garg*, 234 F. Supp. 3d 477, 494 (S.D.N.Y. 2017) ("Fraudulent concealment claims have the additional element that the defendant had a duty to disclose the material information." (quoting *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003))).  In any event, BCI fails to identify evidence sufficient to support either claim.

[5]  The Management Agreement expressly provided BCI with an early-termination option if Kahelin left LMC SE – "Upon Peter Kahelin's death, Disability[,] or termination of employment with [LMC SE], [BCI] may terminate this Agreement with not less than 90 days written notice thereof."  (Doc. No. 49-8 at 41).  Kahelin told BCI he was going to retire over a month before BCI executed the 2017 Amendment, and that Amendment in effect provided seven months' notice rather than three months.

Moreover, BCI's professed financial concerns, while certainly substantial, are no basis for a duress argument. Rather, under New York law, "[a] threatened breach of contract for which there are adequate legal remedies does not constitute duress." *Nelson*, 713 F. Supp. at 110 (quoting *Neuman v. Pike,* 591 F.2d 191, 194 (2d Cir. 1979)). If LMC SE's personnel changes in fact constituted a breach of contract, BCI plainly had a legal remedy. BCI cannot establish it entered the 2017 Amendment under duress.

Additionally, even if the 2017 Amendment did not ratify the Management Agreement, BCI cannot state a claim for fraudulent inducement. As I concluded above, the parties' relationship was a contractual relationship, not a fiduciary one, so the Moorgate Defendants did not have an "affirmative duty to disclose material information." *PetEdge, Inc. v. Garg,* 234 F. Supp. 3d 477, 494 (S.D.N.Y. 2017) (quoting *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 155 (2d Cir. 1995)). BCI cannot explain its failure to press Kahelin on the identity of his partners by claiming the Moorgate Defendants should have been more forthcoming. *Cf. ACA Fin. Guar. Corp. v. Goldman, Sachs & Co.*, 32 N.E.3d 921, 923 (N.Y. 2015) (holding plaintiff adequately pled fraudulent inducement by alleging it asked specific questions about the participants in the transaction and that it reasonably relied on defendant's affirmative misrepresentation).

I conclude Defendants are entitled to summary judgment on Plaintiffs' fraudulent inducement claim as a matter of law.

### D.    CONSTRUCTIVE TRUST AND INJUNCTIVE RELIEF

Defendants also seek summary judgment on Plaintiffs' requests for the imposition of a constructive trust on all amounts paid to Moorgate (Count IX), and for the appointment of a third-party valuation firm to be used in determining the amount of the Incentive Fee and an injunction prohibiting Moorgate and its principles from communicating with that third-party valuation firm (Count X).

19

"A constructive trust arises by operation of law against one who through any form of unconscionable conduct holds legal title to property where equity and good conscience demands that he should not hold such title." *Dixon v. Smith*, 695 N.E.2d 284, 291 (Ohio Ct. App. 1997) (citation omitted); *see also Ferguson v. Owens*, 459 N.E.2d 193, 1295-96 (Ohio 1984) (A constructive trust usually is "invoked when property has been acquired by fraud . . . [but] may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud.").

As I concluded above, BCI fails to show Moorgate had a fiduciary duty which it breached or that Moorgate breached one of the contracts between those parties.  Therefore, Moorgate is entitled to summary judgment on Count IX.

For the reasons discussed above, I grant Defendants summary judgment on Plaintiffs' request for an injunction prohibiting Moorgate and its principals from communicating with a third-party valuation firm.  Any such communications remain subject to Defendants' remaining contractual confidentiality obligations.  Finally, for the reasons discussed below, I deny Defendants' motion for summary judgment on the portion of Count X which seeks the appointment of a valuation firm.

### E.    LMC SE's Counterclaim

LMC SE also seeks summary judgment on its counterclaim against BCI.  LMC SE alleges BCI breached the Management Agreement by refusing to participate in the process for determining the Incentive Fee and also breached the duty of good faith and fair dealing implied into that contract.  (Doc. No. 18 at 30-31).  LMC SE contends it is entitled to an award of $15.625 million to satisfy BCI's obligation to pay the Incentive Fee, calculated based upon LMC SE's expert witness's valuation of MaxxSouth as of March 31, 2018.  (Doc. No. 49 at 47-48).

Ohio does not recognize a separate cause of action for breach of the covenant of good faith and fair dealing, *Lucarell v. Nationwide Mut. Ins. Co.*, 97 N.E.3d 458, 470 (Ohio 2018), so LMC SE must prove BCI violated this implied duty by the manner in which it exercised its "discretion in performing a contractual duty" in order to establish this claim. *Fox v. Nationwide Mut. Ins. Co.*, 117 N.E.3d 121, 138 (Ohio Ct. App. 2018). "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties." *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1082-83 (Ohio 1996) (citation omitted).

The Management Agreement calls for the parties to seek to determine the Incentive Fee by reference to MaxxSouth's value at the end of the contract's term (the "Terminal Company Enterprise Value"). The contract provides that the Terminal Company Enterprise Value "shall be determined by the mutual agreement of [BCI and LMC SE] or, in the event the parties are unable to agree . . . then by an independent third party valuation firm reasonably acceptable to [BCI and LMC SE]." (Doc. No. 49-3 at 34-35).

While BCI disparages LMC SE's argument in support of its counterclaim as "not serious and . . . a waste of everyone's time and effort[,]" (Doc. No. 63 at 55), BCI offers no response to LMC SE's claim that BCI breached the Management Agreement by failing to engage in the process to retain a third-party valuation firm to determine the Terminal Company Enterprise Value. Block acknowledged that LMC SE provided a list of firms and that BCI did not engage in a discussion with LMC SE about those firms or provide its own list of firms. (Doc. No. 49-1 at 116-17). I conclude BCI breached the Management Agreement by failing to fulfill its duty to engage in the selection of an independent third-party valuation firm.

I also conclude, however, that LMC SE fails to show the absence of a genuine dispute of material fact as to whether this failure was in bad faith. The parties offer conflicting descriptions of

BCI's motivations during this process.  Further, reflecting the parties' optimism at the time they negotiated the Management Agreement, the contract does not provide a next step in the event the parties were unable to agree on a valuation firm.  Viewing the evidence in the light most favorable to BCI, a jury could find BCI did not take "opportunistic advantage in a way that could not have been contemplated at the time of drafting."  *Ed Schory & Sons, Inc.*, 662 N.E.2d at 1082.

Ohio law, however, fills this contractual gap.  A court considering a breach of contract claim involving a contractual alternate dispute resolution provision has "power to compel specific performance of a contractual agreement to participate in" the parties' agreed-upon method of alternate dispute resolution.  *Palumbo v. Select Mgmt. Holdings, Inc.*, 2003-Ohio-6045, 2003 WL 22674397, *3 (Ohio Ct. App. Nov. 13, 2003) (citing *Oglebay Norton Co. v. Armco, Inc.*, 556 N.E.2d 515, 521 (Ohio 1990)); *see also Ohio Council 8, Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Ohio Dep't of Mental Retardation & Developmental Disabilities*, 459 N.E.2d 220, 223 (Ohio 1984) (Parties which agree to submit a subject in dispute to a third party for resolution will be bound by the third party's decision.).

LMC SE argues it should not be required to engage in the valuation process and instead should be awarded damages in the amount calculated by its expert witness.  This argument is not persuasive.  The Management Agreement does not establish that the Incentive Fee provision operates for BCI's benefit.  (*See* Doc. No. 49 at 46).  Nor does LMC SE establish the contractual valuation mechanism is "so fundamental to the contract that [BCI's] failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform."  *Becker v. Direct Energy, LP*, 112 N.E.3d 978, 989 (Ohio Ct. App. 2018) (citation and internal quotation marks omitted).  Moreover, the "normal remedy for a breach of contract claim is to give the injured party such relief as will put him in as good a position as if the contract had been performed."  *Tucker v. Young*, 2006-Ohio-1126, 2006 WL 574309, *7 (Ohio Ct. App. Mar. 6, 2006) (citations omitted).

Therefore, I order BCI and LMC SE to comply with their contractual obligations to select a third-party valuation firm to determine the Terminal Company Enterprise Value.  *See, e.g., Mr. Mark Corp. v. Rush, Inc.*, 464 N.E.2d 586, 591 (Ohio Ct. App. 1983) (A court ordering specific performance of a contract "may establish and direct procedures to accomplish that performance, so long as those procedures neither add to nor detract from significant obligations of the parties which have been established by the contract . . . .").  BCI and LMC SE each shall identify three valuation firms and exchange the names of those firms, ranked in order of preference, on or before April 15, 2021.  If, following this exchange, the parties are unable to agree upon a firm, the parties' first-ranked choices shall select the third-party valuation firm which shall conduct the valuation.  That valuation shall constitute the Terminal Company Enterprise Value and shall be used to calculate the Incentive Fee.  (*See* Doc. No. 49-3 at 34-35, 40).  BCI and LMC SE shall equally share the cost of the valuation.

Thus, I grant LMC SE's motion for summary judgment on its counterclaim as to its claim that BCI breached its contractual duty to participate in the selection of a third-party valuation firm and deny its motion as to the remainder of the counterclaim.

## F.    ATTORNEY FEES

Defendants also seek attorneys' fees, costs, and expenses arising out of this litigation.  The Retention Agreement and the MaxxSouth Agreement contain the same attorney-fee provision: "In the event of the bringing of any action, or suit by a Party against the other Party, arising out of or relating to this Agreement, the Party in whose favor the final judgment or award shall be entered shall be entitled to have and recover from the other Party the costs and expenses incurred in connection therewith, including its reasonable attorneys' fees."  (Doc. No. 49-3 at 15 and 24).  The Management Agreement awards reasonable attorneys' fees, costs, and expenses to "the substantially prevailing party."  (*Id.* at 48).

Defendants represent they "will make an appropriate submission to demonstrate the attorneys' fees, costs, and expenses incurred in this matter, which BCI is contractually obligated to pay." (Doc. No. 49 at 48).  Therefore, I will defer consideration of these matters until Defendants offer this submission.

G.    MOTION TO COMPEL

Defendants filed a motion to compel Plaintiffs to produce certain communications and other documents in connection to the Waller Report.  (Doc. Nos. 37 and 38).  Plaintiffs sought to withhold the requested discovery on the basis that it was protected because the Waller Report was produced in anticipation of litigation.  Defendants argue the Waller Report was produced for an ordinary business reason and therefore is not protected.  In light of the conclusions I have reached above, particularly with regard to the parties' obligation to retain the services of an independent valuation firm for the purpose of determining MaxxSouth's Terminal Enterprise Value, I conclude Defendants' motion is moot.

V.    CONCLUSION

For the reasons stated above, I grant Defendants' motion for summary judgment (Doc. Nos. 49 and 50), as to each claim in the complaint except the portion of Count X which seeks appointment of a third party valuation firm, and as to the portion of LMC SE's counterclaim which asserts BCI breached the Management Agreement by failing to participate in the selection process for the third party valuation firm.  I deny Defendants' motion as to the appointment claim in Count X and as to the remainder of LMC SE's counterclaim.

Further, I also deny Defendants' motion to compel production of certain discovery, (Doc. Nos. 37 and 38), as moot.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge