UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Block Communications, Inc., *et al.*,

Plaintiffs,

v.

Moorgate Capital Partners, LLC, *et al.*,

Defendants.

Case No. 3:18-cv-1315

MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

I previously ordered Plaintiffs and Counterclaim Defendants Block Communications, Inc. and BCI Mississippi Broadband, LLC, (collectively, "BCI"), and Defendants Moorgate Capital Partners, LLC, Moorgate Securities, LLC, and Defendant-Counterclaim Plaintiff LMC Southeast Cable Partners, LLC, (collectively, "Moorgate"), to brief the issue of whether the final report prepared by Houlihan Lokey should be accepted or rejected. (Doc. No. 136).

Houlihan Lokey was tasked with ascertaining "the Terminal Company Enterprise Value of MaxxSouth 'based upon an analysis of the recent prices paid by purchasers of similar companies under similar circumstances.'" (Doc. No. 100 at 1) (quoting Doc. No. 49-8 at 33). Houlihan Lokey issued its final report on December 9, 2023. (*See* Doc. No. 139-1 at 4-112). Briefing on the acceptability of Houlihan Lokey's conclusions in that final report is now complete. (Doc. Nos. 139, 140, 141, and 142).

## II. BACKGROUND

BCI and LMC Southeast are parties to a Management Agreement which called for LMC Southeast to manage the operations of MaxxSouth, a regional cable system operating in Mississippi and Alabama which BCI had purchased. (*See* Doc. No. 49-8 at 28-48) (filed under seal). The Management Agreement provided that LMC Southeast would be compensated at set periods, including an Incentive Fee to be calculated upon the sale of MaxxSouth or the expiration of the Management Agreement. (*Id.* at 38-39). Calculation of the Incentive Fee depended in part on MaxxSouth's value, a determination described as the Terminal Company Enterprise Value. (*Id.* at 32-33, 38).

Under the terms of the Management Agreement, the Terminal Company Enterprise Value is determined by the sale price of MaxxSouth or, if that company was not sold during the term of the Management Agreement, "by the mutual agreement of" BCI Mississippi and LMC Southeast. (*Id.* at 33). If the parties could not agree, "an independent third[–]party valuation firm reasonably acceptable" to the parties would make the determination. (*Id.*). In the absence of a sale, the Terminal Company Enterprise Value would "be determined based upon an analysis of the recent prices paid by purchasers of similar companies under similar circumstances." (*Id.*).

BCI Mississippi and LMC Southeast were unable to agree upon the Terminal Company Enterprise Value at the conclusion of the parties' contractual relationship, and this litigation followed. After the parties filed for summary judgment, I concluded BCI had breached its duty under the Management Agreement "to engage in the process to retain an independent third-party valuation firm" to determine the Terminal Company Enterprise Value. (Doc. No. 70 at 21). I then ordered the parties, pursuant to well-settled Ohio law,[1] to "identify three valuation firms and

[1] *See Palumbo v. Select Mgmt. Holdings, Inc.*, 2003-Ohio-6045, 2003 WL 22674397, *3 (Ohio Ct. App. Nov. 13, 2003) (citing *Oglebay Norton Co. v. Armco, Inc.,* 556 N.E.2d 515, 521 (Ohio 1990)), and *Mr. Mark Corp. v. Rush, Inc.*, 464 N.E.2d 586, 591 (Ohio Ct. App. 1983).

exchange the names of those firms, ranked in order of preference . . . . If, following this exchange, the parties are unable to agree upon a firm, the parties' first-ranked choices shall select the third-party valuation firm which shall conduct the valuation." (*Id.* at 23).

The parties again were unable to agree. Because the parties failed to comply with my specific performance order, I then ordered the parties to each submit three proposed valuation firms for my consideration. (Doc. No. 75). After reviewing the parties' submissions, I ordered that Houlihan Lokey be appointed as the third-party valuation firm responsible for calculating the Terminal Company Enterprise Value.[2] (Doc. No. 100). The parties submitted information to and engaged in discussions with Houlihan Lokey, eventually leading to the production of Houlihan Lokey's final report. (*See* Doc. No. 139-1 at 4-112). Houlihan Lokey determined the Terminal Company Enterprise Value to be $259,100,000. (*Id.* at 17).

## III. DISCUSSION

BCI argues I should reject Houlihan Lokey's final report because:

> [the metrics Houlihan employed], the process by which it "analyzed" them, and the final valuation itself all utterly fail to satisfy the contract requirements: that the valuation align with expert practice; that it be based on an analysis of sales of "similar companies under similar circumstances"; and that the valuator be independent.

(Doc. No. 140 at 2-3). (*See also id.* at 3 n.3) (arguing Houlihan Lokey was not independent because it allegedly did not employ "criteria and analytic processes actually employed by legitimate valuation firms"). BCI contends that, after rejecting Houlihan Lokey's report, I must set deadlines for further discovery, including competing expert reports calculating the Terminal Company Enterprise Value, and then set the case for trial.

[2] *See Mr. Mark Corp.*, 464 N.E.2d at 591 (A court ordering specific performance of a contract "may establish and direct procedures to accomplish that performance, so long as those procedures neither add to nor detract from significant obligations of the parties which have been established by the contract . . . .").

Moorgate contends I must accept the final report, arguing BCI's complaints stem from its disagreement with the results of Houlihan Lokey's analysis and fail to demonstrate that Houlihan Lokey failed to follow the process required by the Management Agreement. (*See* Doc. No. 139). Upon accepting the report, Moorgate argues I must use the Terminal Company Enterprise Value calculated in that report to determine the Incentive Fee due to LMC Southeast.

### A. Review of Appraisal

The Management Agreement is governed by Ohio law. (Doc. No. 49-8 at 45). Under Ohio law, "fraud or manifest mistake is a proper legal basis upon which to set aside an appraisal award." *Lakewood Mfg. Co. v. Home Ins. Co. of New York*, 422 F.2d 796, 798 (6th Cir. 1970) (citing *Baltimore & Ohio R.R. v. Stankard*, 46 N.E. 577 (1897)). *See also Am. Storage Ctrs. v. Safeco Ins. Co. of Am.*, 651 F. Supp. 2d 718, 724 (N.D. Ohio 2009) ("Under Ohio law, a court should not generally interfere with an appraisal award absent fraud or manifest mistake.") (citing cases). "A 'manifest mistake' is a mistake of such character that the appraisers would have corrected it if they had been made aware of it, rather than a mere mistake of judgment." *Steiner v. Appalachian Expl., Inc.*, 509 N.E.2d 1271, 1273 (Ohio Ct. App. 1986) (citing *Lakewood*, 422 F.2d at 798).

BCI has not offered any evidence of either fraud or a manifest mistake in Houlihan Lokey's appraisal of MaxxSouth's value at the conclusion of the parties' contractual relationship. (*See generally* Doc. Nos. 140 and 141). Instead, relying on an unpublished Ohio appellate court decision, BCI argues Ohio law "definitively" permits a court to reject an appraisal if the court determines the appraisal "'failed to comply with the [contractual] agreement,'" and contends I must question "whether the work of the valuator or appraiser was conducted in accordance with professional valuation norms . . . ." (Doc. No. 141 at 3) (quoting *Ruggles v. Ruggles Fam. Ltd. P'ship*, 2016-Ohio-1479, 2016 WL 1393910, at *5 (Ohio Ct. App. April 8, 2016)) (emphasis removed).

It is, as BCI suggests, "perfectly sensible" to require an appraiser to adhere to the relevant contractual provisions in conducting an appraisal. (Doc. No. 141 at 4). Thus, an appraiser may not appraise the diminution in value of real property caused by the intrusion of an oil well when the parties' agreement required an appraisal of "all damages to growing crops caused by" the oil well drilling operation. *Steiner*, 509 N.E.2d at 177 (emphasis added). And a court may set aside an appraisal as the product of a manifest mistake when the appraisers failed to follow the court's "clear instructions regarding the process by which an appraisal award was to be achieved," in particular "instructions [that] were material in determining the loss." *Am. Storage*, 651 F. Supp. 2d at 724, 725. *See also id.* at 725 ("Had the participants in the appraisal process been consciously aware that their conduct of the appraisal process was contrary to the Court's orders, they most certainly would have corrected their actions.").

Houlihan Lokey's appraisal complies with the appraisal process requirements found in the Management Agreement – "the Enterprise Value shall be determined based upon an analysis of the recent prices paid by purchasers of similar companies under similar circumstances." (Doc. No. 49-8 at 33). The parties' agreed-upon language in the Management Agreement differs substantially from the more specific language found in other cases, such as those interpreting insurance policies. *Cf. Coppins v. Allstate Indem. Co.*, 857 N.W.2d 896, 899 (Wis. Ct. App. 2014) (setting aside appraisal award calculating insurance coverage for fire-damaged property based upon the "current market value" of the property rather than the "actual cash value" as required and defined by the insurance contract, the insurer's website, and Wisconsin law). Conversely, the plain language of the contract does not impose specific "expert-valuation standards." (Doc. No. 141 at 6). BCI did not bargain for the specific valuation methods for which it advocates in its briefing, and it may not graft those preferred terms into the contract now.

Moreover, BCI's contention that Houlihan Lokey departed from industry standards in considering a "price-per-passing" metric and therefore failed to adhere to the terms of the parties' contract lacks merit. (*See, e.g.,* Doc. No. 140 at 3-4) ("To the best of BCI's knowledge, no parties to actual broadband-company-sales transactions use price-per-passing in assessing the value of the acquired companies; and no expert valuation firm – other than Houlihan – employs price-per-passing as a metric for valuing broadband companies.") (emphasis in original) (footnote omitted). But Moorgate offers evidence that at least five well-known valuation companies also include a price-per-passing metric in their valuations of telecommunications companies like MaxxSouth. (*See* Doc. No. 142-2) (including excerpts of reports authored by Cowen Equity Research (now known as TD Cowen), Bank of America, Credit Suisse, Duff & Phelps (now known as Kroll), and Wells Fargo).

Finally, Ohio law does not permit me to conduct the wide-ranging, fact-intensive analysis BCI prefers. (*See* Doc. No. 140 at 3-15). "[E]ven if the appraisal was against the manifest weight of the evidence," I may not vacate Houlihan Lokey's valuation. *Ruggles*, 2016 WL 1393910, at *5. The numerous decisions BCI cites issued by courts in other states are not persuasive, much less binding, authority, because the standards of review in those states extend beyond the limits of Ohio law.

Take *Leach v. Princeton Surgiplex, LLC*, No. A-6120-11T1, 2013 WL 2436045 (N.J. Super. Ct. App. Div. June 6, 2013), upon which BCI relies to imply an "adherence to professional norms" standard into the parties' agreement here. (*See* Doc. No. 141 at 4-5). The New Jersey Supreme Court had held that challenges to an appraisal award could be raised based upon "fraud, corruption, or similar wrongdoing," as well as "when the appraiser has made a mistake of law or when the appraiser has misapprehended the facts or issues presented." *Leach*, 2013 WL 2436045, at *4, *5 (citing *Elberon Bathing Co. v. Ambassador Ins. Co.*, 389 A.2d 439 (N.J. 1978)) (further citations omitted). *See also Ward v. Merrimack Mut. Fire Ins. Co.*, 753 A.2d 1214, 1221-22 (N.J. Super. Ct. App. Div. 2000) (applying "the 'broad evidence rule' under which the appraiser must consider "'every fact and

circumstance which would logically tend to the formation of a correct estimate of the loss.''''') (quoting *Elberon*, 389 A.2d at 443) (further quoting *McAnarney v. Newark Fire Ins. Co.,* 159 N.E. 902, 905 (N.Y. 1928)). Ohio law does not permit courts to undertake a similar level of review.

BCI's reliance on *Church Mutual Insurance Company v. Circle of Light*, 416 F. Supp. 3d 847 (E.D. Mo. 2019), suffers from the same flaw. In addition to "[f]raud" and "misconduct," Missouri law provides that a court may set aside an appraisal award because of "carelessness[] or partiality on the part of one or more of the appraisers," or if it was "made . . . in disregard of some important relevant facts and in ignorance of others." *Id.* at 851 (citations and internal quotation marks omitted) (third alteration by *Church Mut.*). But Ohio law prohibits courts from rejecting an appraisal award based upon "a mere mistake in judgment." *Steiner*, 509 N.E.2d at 1273. BCI has not demonstrated that Missouri's more probing standard of review is relevant to this case.

BCI fails to show there is a basis under Ohio law to reject Houlihan Lokey's December 9, 2023 report. Therefore, I overrule BCI's objections to the report and adopt the report's findings.

### B. THE INCENTIVE FEE

Section 4.2 of the Management Agreement requires that the Inventive Fee be calculated by subtracting the Initial Company Enterprise Value from the Terminal Company Enterprise Value and multiplying the difference by 12.5%. (Doc. No. 49-8 at 38). The Initial Company Enterprise Value is defined as $200 million. (*Id.* at 31). As I noted above, Houlihan Lokey determined the Terminal Company Enterprise Value to be $259.1 million. Pursuant to the parties' agreement, I conclude the Inventive Fee owed to LMC Southeast is $7,387,500 (($259,100,000 - $200,000,000) x .125) and enter judgment in that amount in favor of LMC Southeast.

As Defendants note, the only remaining issues in this case are the appropriateness and amount of prejudgment interest, attorney fees, and costs. Defendants shall file a motion in support of their request for an award of interest, fees, and costs within 21 days of the filing of this

Memorandum Opinion and Order. Plaintiffs shall file their response to that motion within 14 days of the date on which Defendants file the motion, and Defendants may file a brief in reply within 10 days of the date of Plaintiffs' response brief.

## IV. CONCLUSION

For the reasons stated above, I overrule the objections of Plaintiffs and Counterclaim Defendants Block Communications, Inc. and BCI Mississippi Broadband, LLC, to Houlihan Lokey's December 9, 2023 report and accept that report in fulfillment of Houlihan Lokey's duties in this litigation. (*See* Doc. Nos. 100 and 104). I enter judgment in favor of Defendant and Counterclaim Plaintiff LMC Southeast Cable Partners, LLC, in the amount of $7,387,500.

Further, as described above, I order Defendants to file a motion for prejudgment interest, attorney fees, and costs.

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge